# Exhibit D

## AUS Merchant Services, Inc. Statement of Facts

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Non-Prosecution Agreement (the "Agreement") between the Government and AUS (as defined in the Agreement). AUS agrees and stipulates that the following information is true and accurate. AUS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the Government later pursue the prosecution that is covered by this Agreement, AUS agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts describe events that occurred between approximately January 2020 and December 2023.

**A. AUS Background and Business Model**

1. AUS (formerly known as Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.) was registered in Delaware and maintained its principal place of business at 525 Almanor Avenue, Sunnyvale, California 94085.

2. Partnering with certain of its affiliates, AUS offered payment processing services to the e-commerce platforms that were owned and operated by Alibaba Group Holding Limited and its relevant subsidiaries ("Alibaba"), including Alibaba.com. Alibaba Group Holding Limited was organized and existed under the laws of the Cayman Islands, with its principal executive offices in Hangzhou, China.

3. AUS's business model included, but was not limited to, providing payment processing and settlement services to enable overseas sellers on Alibaba.com to accept payments from United States-based buyers. When AUS facilitated payment processing and settlement services for Alibaba's merchants selling to United States-based buyers, it received certain information about transactions. The information generally included the merchant's and buyer's identities as well as a description of the product ordered ("sale order") through Alibaba.com. AUS commenced payment processing and settlement services for Alibaba.com transactions in 2020.

4. AUS's payment processing and settlement services included accepting United States Dollar-denominated payments on behalf of overseas merchants linked to sales orders on Alibaba.com.

5. Payors could make payments linked to Alibaba's e-commerce transactions in multiple ways, including through credit card payments, other alternative payment methods, or, solely for Alibaba.com, wire transfer. The United States Dollar-denominated wire transfer payments directed to overseas merchants on Alibaba.com were accepted by AUS into one of two United States based-bank accounts of AUS. When Alibaba.com buyers paid via wire transfer in U.S. dollars, the checkout page instructed buyers to include in the wire transfer instructions what was identified as the overseas merchant's "beneficiary account number" as well as the Alibaba.com order number.

6. The "beneficiary account number" was a unique routable identification number, which caused the deposits to be transferred to one of AUS's United States-based bank accounts, and for AUS or its affiliate to associate that credit with a specific merchant. Once payments were deposited into AUS's United States-based bank accounts, AUS transferred the funds to offshore accounts held by an AUS affiliate. The AUS affiliate then handled settlement of the transaction to the overseas merchant associated with that particular "beneficiary account number."

7. Beginning in July 2021, AUS also offered settlement services to support payments to merchants using the Alibaba.com Pay service ("Alibaba.com Pay"), which was separate from the Alibaba.com e-commerce platform. Unlike the global payment processing and settlement services for orders made on the Alibaba.com e-commerce site, merchants uploaded supporting documentation into a portal for sales consummated outside of the e-commerce site. Such transactions were higher risk because the Alibaba e-commerce platform did not electronically monitor data in real time as to the nature and purpose of the transaction.

## B. Legal and Regulatory Background

8. Congress enacted the Bank Secrecy Act ("BSA") to address an increase in criminal money laundering activity utilizing financial institutions. The BSA requires financial institutions to establish, implement, and maintain risk-based anti-money laundering ("AML") programs to combat money laundering and the financing of terrorism through financial institutions.

9. AUS is a "financial institution" as defined in the BSA. 31 U.S.C. § 5312(a)(2); 31 C.F.R. § 1010.100. As a financial institution and money services business ("MSB"), AUS is required to establish, implement, and maintain an effective AML compliance program that, at a minimum, provides for: (a) internal policies, procedures, and controls reasonably designed to prevent money laundering; (b) a program design commensurate with the risks posed by the location, size, nature, and volume of the financial services provided by the MSB; (c) an individual to coordinate and monitor day-to-day compliance with the BSA and AML requirements; (d) an ongoing employee training program; (e) independent review of programs; and (f) procedures reasonably designed to assure compliance with BSA and AML requirements when conducting operations via data processing systems. 31 U.S.C. § 5318(h); 31 C.F.R. § 1022.210.

10. To satisfy the BSA's requirements, an MSB must maintain a risk-based AML program, tailor its systems for identifying suspicious activity to effectively monitor its customer base and the products and services it offers, and report suspicious activity. Moreover, an MSB's AML policies, procedures, and controls must be calibrated to address emerging and evolving risk, including risk associated with new products and services and new patterns of suspicious activity.

11. The BSA authorizes the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

12. At all times relevant to this case, by regulation, FinCEN required MSBs to file a Suspicious Activity Report ("SAR") on any transaction involving or aggregating at least $2,000

where the MSB "knows, suspects, or has reason to suspect." 31 C.F.R. § 1022.320(a)(2). These requirements apply to a transaction that:

a. involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

b. is designed to evade any requirements of the BSA or of any other regulations promulgated under the BSA;

c. has no business or apparent lawful purpose, and the MSB knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

d. involves use of the MSB to facilitate criminal activity.

13. MSBs have an obligation to file a SAR "no later than 30 calendar days after the date of initial detection . . . of facts that may constitute a basis for filing a SAR." *Id.* § 1022.320(b)(3).

**C. AUS's Risk Function and AML Compliance Program Did Not Prevent Federal Food, Drug, and Cosmetic Act ("FDCA") Violations by Alibaba Merchants and Other Bad Actors.**

14. With respect to AUS's U.S.-based customers, AUS conducted "Know Your Customer" protocols and due diligence. With respect to AUS's affiliates' overseas customers, AUS relied upon AUS's overseas affiliates to conduct certain functions of its AML compliance program for overseas merchants, including those customers using AUS for wire transfers. Until 2022, AUS relied upon AUS's overseas affiliates to monitor transactions involving overseas merchants selling goods on Alibaba.com, including those using AUS's unique routable identification numbers for wire transfers. In 2022, AUS also began using its own transaction monitoring system, previously used for other products—for transactions originating on Alibaba.com, rather than continuing to rely on its overseas affiliates. However, when implementing this change, AUS failed to fully incorporate wire data from its United States-based bank accounts to supplement the sales order data that it used to monitor. As a result, AUS's monitoring did not always show that some of these wire transfer transactions were funded by payments originating from high-risk jurisdictions or from multiple payors on a single invoice.

15. AUS and its affiliates would, in certain instances, report merchants who sold Subject Merchandise on Alibaba's e-commerce platforms, including Alibaba.com, to Alibaba, rather than systematically restricting those merchants themselves.

16. At times, Alibaba.com's overseas merchants used AUS's payment processing and settlement services to facilitate the sale and importation of Subject Merchandise, including pharmaceutical products, into the United States, in violation of the FDCA.

17. In October 2022, AUS created a case investigating Merchant A, an Alibaba overseas merchant who used AUS's payment processing and settlement services. An AUS employee reviewed the sales order information and noted that Merchant A had sold prohibited Subject Merchandise to United States customers using AUS's payment processing services. AUS filed a regulatory report in connection with Merchant A's transaction in October 2022 and relevant prior activity. In January 2023, Merchant A sold additional prohibited Subject Merchandise to a United States customer. In July 2023, an AUS employee reviewed the transaction and sales order and noted that the product was "prohibited" and could not "be sold online without prescription," but concluded that the activity was below the regulatory reporting requirements.

18. AUS acknowledges that it processed transactions for sales between overseas merchants for Alibaba.com and United States-based buyers, which involved Subject Merchandise that was imported into the United States in violation of law. AUS agrees not to contest the forfeiture of the Forfeiture Amount of $190 million pursuant to Title 18, U.S. Code, Section 545.